THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>IMMERSION CORPORATION, a Delaware corporation,<br><br>Defendant. | No. CV 07-936-RSM<br><br>**PLAINTIFF MICROSOFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANT IMMERSION'S AFFIRMATIVE DEFENSES**<br><br>Noted For: July 18, 2008<br>Oral Argument Requested |

## I. INTRODUCTION

After months of negotiations, Sony and Immersion settled Immersion's patent infringement suit against Sony ("Sony Lawsuit").  The terms of the settlement included a payments by Sony of approximately $150 million and the dismissal of its appeals in exchange for a license to Immersion's patent portfolio and dissolution of a permanent injunction.

This settlement triggered Immersion's obligations to Microsoft under a Sublicense Agreement ("SLA"), which was entered into on July 25, 2003 between Microsoft and Immersion as part of their earlier settlement of the same case ("Microsoft Settlement").  The SLA provides that "in the event Immersion elects in its discretion to settle the Sony

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 1
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

Dockets.Justia.com

1  Lawsuit," Immersion owes Microsoft certain sums depending upon the value of the

2  settlement with Sony. Immersion has breached the SLA by failing to make the required

3  payments.

4  Immersion argues that even it did settle with Sony and Immersion's obligations to

5  Microsoft under the SLA were triggered, Immersion is not liable because the payback

6  provisions in section s(e) of the SLA are invalid under seven legal theories raised in

7  Immersion's affirmative defenses. The themes of these defenses are that the settlement

8  was just too good of a deal for Microsoft and that it is improper for Immersion to pay

9  Microsoft a percentage of the money it received from Sony. However, there is no basis for

10 these defenses. Washington Courts have approved provisions like section 2(e) and even

11 found them to be beneficial to settling lawsuits. The Microsoft Settlement, including the

12 SLA, represents the culmination of weeks of negotiations between two sophisticated

13 companies with the aid of highly skilled in house and outside counsel. After the

14 agreements were executed, Immersion expressed its approval and enthusiasm for the deal.

15 Immersion immediately benefited in the form of a more than two-fold increase of its stock

16 price, in addition to the $26 million cash infusion it received from Microsoft. The

17 Microsoft Settlement represented a fair and efficient way to resolve the litigation and

18 provide Immersion with a substantial sum of money to support its business under the strain

19 of continuing litigation against Sony.

20 Microsoft requests that the Court grant its motion for partial summary judgment on

21 seven of Immersion's substantive affirmative defenses: (1) champerty and maintenance;

22 (2) frustration of purpose; (3) illegality; (4) violation of public policy; (5) unclean hands;

23 (6) unjust enrichment; and (7) unconscionability. All of these defenses are matters of law

24 for the Court to resolve.

25

26

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

## II. STATEMENT OF FACTS

Microsoft presented the Court with a detailed statement of facts in Microsoft's Motion for Partial Summary Judgment on Breach of Contract filed concurrently with this motion. Microsoft incorporates that factual statement and the declarations and documents supporting it. The following factual background highlights facts that are particularly relevant to Immersion's affirmative defenses.

On February 11, 2002, Immersion initiated litigation against Sony and Microsoft in the U.S. District Court for the Northern District of California ("Sony Lawsuit"). Immersion alleged that the defendants violated certain Immersion patents. Decl. of Wendy E. Lyon In Support Of Microsoft's Motion for Summary Judgment On Breach of Contract,[1] Ex. 3. After several months of litigation, Immersion and Microsoft began negotiating resolution of Immersion's claims against Microsoft in the Sony Lawsuit. Declaration of Steve McGrath. The negotiations took place over several weeks. Id. Each side was represented by both in-house and outside counsel, and by business persons. Viegas Dep., 39: 1-7, 41 7-11, 41:17-42:20, Ex. 62; Reutens Dep., 54:10-55:17, Ex. 63, and Exs. 59 and 60. Immersion was represented by Irella & Manella LLP and had Gray Cary Ware & Freidenrich LLP as outside corporate counsel. Id. The parties met in person on several occasions in both San Jose and Redmond, held numerous conference calls, and exchanged many emails. McGrath Decl.; Viegas Dep., 39:16-38:7; Reutens Dep., 43:25-45:8. Immersion admits that the negations were professional, in good faith and at arms length. Viegas Dep., 38:7-17.

The settlement was accomplished through the execution of five interrelated agreements: the Sublicense Agreement ("SLA"), Settlement and Mutual Release Agreement, License Agreement, Stock Purchase Agreement, and Debenture Agreement.

---

[1] All references to Exhibits in this motion are attached to the Lyon Decl.

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 3
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1   Exs. 2, 5, 6, 7, and 8. Pursuant to these agreements Microsoft paid a total of $26 million to

2   Immersion: $20 million was allocated towards a license and sublicensing rights, and

3   $6 million was a stock investment in Immersion. Id. The Debenture Agreement gave

4   Immersion an option to sell up to $9 million of additional stock to Microsoft. The

5   debenture was never exercised by Immersion. Viegas Dep., 48:3-10, Ex. 62.

6       Prior to the execution of the agreements on July 25, 2003, the parties exchanged

7   numerous redlined drafts of each agreement. McGrath Decl.; Birnholz Dep. 56:2-20; 61:2-

8   23, 62:14-68:23, Exs. 63 and 69; and Ex. 60. These drafts were reviewed by Immersion's

9   in-house and outside counsel. Id.; Reutens Dep., 159:17-160:2, Ex. 63, and Ex. 60. The

10  Settlement Agreement explicitly confirms that "Immersion and Microsoft have both been

11  represented by counsel in entering into this Settlement and Exhibits, counsel has reviewed

12  the Settlement, including the Exhibits, and advised as to any and all risks, and Immersion

13  and Microsoft each freely enter into this Settlement. Ex. 5 at ¶ 9. The Sublicense

14  Agreement and License Agreement also provide that "[t]his Agreement has been

15  negotiated by the Parties and their respective counsel." Exs. 2 and 6 at ¶ 9(e).

16      Under section 2(e) of the SLA, if Immersion settles the Sony Lawsuit with Sony for

17  an amount from $0 to $100 million, Immersion shall pay Microsoft the sum of $15 million.

18  Ex. 2 at ¶ 2(e). If Immersion settles the Sony Lawsuit for an amount between $100 million

19  and $150 million, Immersion shall pay Microsoft an additional amount equal to 25% of the

20  amount of the settlement in excess of $100 million. If Immersion settles the Sony Lawsuit

21  for an amount in excess of $150 million, Immersion shall pay Microsoft an additional

22  amount equal to 17.5% of the amount of the settlement in excess of $150 million. Id.

23      The settlement with Microsoft provided Immersion with immediate and substantial

24  income and other benefits. Immersion received $26 million, which was sufficient keep it

25  in business during a long and expensive battle with Sony—the Sony Lawsuit eventually

26  cost Immersion $25 million in attorney fees. 1/23/07 Letter, pg. 7, Ex. 18. The Microsoft

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 4
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

settlement and investment also provided market acceptance or market recognition for its

technology because the settlement demonstrated the value of Immersion's technology.

Viegas Dep. 159:9-13, Ex. 62. As Immersion stated to the press in describing the

Microsoft Settlement, "The settlement with Microsoft enhances our ability to pursue and

execute in these new markets. It also provides us with significant resources to actively

protect and license our 196 haptic patents." Immersion July 28, 2003 8-K, Ex. 57. At the

close of the deal, Immersion hosted a celebration dinner. Ex. 58; Viegas Dep. 174:19-

175:22, Ex. 62. Upon the public announcement of the Microsoft settlement, Immersion

stock nearly tripled in value. Ex. 19. In the months following, Immersion continued to

express its satisfaction with the Microsoft settlement. Viegas Dep. 158:10-159:25, 161:17-

171:21, Ex. 62. For example, in a March 28, 2005 Forbes magazine article, Immersion's

CEO was quoted, "Viegas says the deal with Microsoft gave it a stronger negotiating

position with other companies, and should give it increased leverage with Sony should the

two come to the negotiating table." Ex. 20; Viegas Dep. 168:11-170:21.

When entering into the SLA, Immersion anticipated that Immersion would payback

Microsoft a minimum of $15 million and possibly much more. During their settlement

negotiations, Immersion and Microsoft discussed various scenarios where Immersion

would recover $25 to $350 million, which would result in payments to Microsoft in the

range of $25 to $92.5 million. Litigation Payout Analysis, Ex. 61, Reutens Dep., 144:21-

145:3, 146:15-23, 152:9-154:12, Ex. 63. Throughout the continuing Sony Lawsuit,

Immersion's financial statements submitted to the SEC every quarter disclosed its

obligations under the SLA and showed a minimum obligation to Microsoft of $15 million.

SEC filings, Exs. 12–16; Deposition of Stephen Ambler, 28:16-20, 30:18- 31:7, 31:24-

32:7, 34:7-17, 37:25- 38:6, 40:1-5, 40:23- 41:14, 58:18- 59:19, 59:25- 60:20, 61:3-12,

73:21-25, 76:2-7, 78:1-9, Ex. 66. In a January 6, 2007 letter from Immersion to the

Securities Exchange Commission ("SEC"), Immersion explained "the Company would

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 5
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  potentially pay back all $26 million (and at a minimum $15 million) upon a settlement with

2  Sony." 1/6/07 Letter, Ex. 9; Ambler Dep., 88:22-89:20; 92:8-25; 10018-102:20, Ex. 66. It

3  also stated, "Note that payment of the $15 million is not within the control of Immersion as

4  *only an unfavorable judicial outcome* will relieve Immersion of this liability, i.e. settlement

5  of amounts between $0 and $100 million would result in Immersion paying $15 million to

6  Microsoft." Id. (emphasis added).

7         After the Microsoft Settlement, Immersion continued to prosecute its claims against

8  Sony, and on September 21, 2004, Immersion obtained a verdict against Sony. The court

9  then entered an Amended Judgment, issued a Permanent Injunction, an then stayed the

10  Permanent Injunction pending Sony's appeals and required Sony to pay Compulsory

11  License Fees in the interim. Ex. 21–27.

12        After several months of negotiations while the appeal was ongoing, Immersion and

13  Sony executed an agreement on or about March 1, 2007, ("Sony/Immersion Agreement"),

14  providing Sony a license to use the immersion's litigated and other patents, requiring

15  payment from Sony of $22.5 million as partial consideration for these licenses, and

16  providing a covenant from Immersion not to enforce the Permanent Injunction. Ex. 1.

17  Sony and Immersion also executed agreements to release $97.2 million from an escrow

18  account to satisfy the Amended Judgment against Sony, to dismiss the appeals, and to

19  dissolve the Permanent Injunction. Exs. 23, 30 and 39. As a result of these agreements,

20  Sony will have paid Immersion more than $150 million. Microsoft contends that

21  Immersion settled with Sony. Immersion disputes that conclusion. Resolution of that

22  dispute is not necessary to resolve this motion.

23        Immersion also argues that even if it settled the Sony Lawsuit with Sony, it is not

24  obligated to pay Microsoft under Section 2(e) of the SLA because of certain affirmative

25  defenses. However, each of these defenses is invalid as a matter of law.

26

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 6
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

# III. ARGUMENT

## A.     Champerty And Maintenance

In its fourth affirmative defense, Immersion claims that the repayment obligations of the SLA are void under the doctrines of champerty and maintenance. The doctrines of champerty and maintenance are ancient English common law doctrines that do not apply here . Champerty is the intermeddling of a stranger in the litigation of another, for profit, and maintenance is the financing of such intermeddling.'" Giambattista v. National Bank of Commerce of Seattle, 21 Wash. App. 723, 586 P.2d 1180 (1978); see also Black's Law Dictionary, Abridged Seventh Edition, 182 (2000) (Champerty is "[a]n agreement between a stranger to a lawsuit and a litigant by which the stranger pursues the litigant's claim as consideration for receiving part of any judgment proceed," and maintenance is "[a]ssistance in prosecuting or defending a lawsuit given to a litigant by someone who has no bona fide interest in the case; meddling in someone else's litigation."). It is questionable whether these doctrines even exist in Washington. Even if they remain viable at all, they plainly do not apply to the Microsoft Settlement.

### 1.     Washington Courts Have Minimized or Eliminated the Availability of Champerty and Maintenance Defenses.

As far back as 1910, the Washington Supreme Court stated that "the common law doctrine of maintenance, like that of champerty, has never obtained a foothold in this state . . . ." Weed v. Foster, 58 Wash. 675, 678,109 P. 123 (1910). Contracts granting a contingency interest in litigation have been uniformly enforced, including assignments of a recovery arising out of an alleged tort. Id. at 677. Personal injury claims have long been assignable to another. Kommavongsa v. Haskell, 149 Wash.2d 288, 305, 67 P.3d 1068 (2003). Washington law also permits the assignment of contractual claims. See, e.g., Public Utility Dist. No. 1 of Klickitat County v. International Ins. Public Utility Dist. No. 1

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 7
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    of Klickitat County v. International Ins. Co., 124 Wash. 2d 789, 800, 881 P.2d 1020

2    (1994).

3       The Washington Court of Appeals has directly challenged the viability of

4    champerty and maintenance explicitly stating, "[i]t is questionable whether any remnants of

5    these doctrines remain in this state." Giambattista v. National Bank of Commerce of

6    Seattle, 21 Wash. App. 723, 733, 586 P.2d 1180 (1978). In Giambattista, Judge Dore,

7    concurring in part and dissenting in part, stated, "I believe and specifically hold that

8    maintenance and champerty is abrogated in the State of Washington pursuant to RCW

9    9.12.010." Id. at 748.[2]

10       In a modern case, the Washington Court of Appeals refused to apply either

11    doctrine, upholding and enforcing an agreement to do exactly what Immersion accuses

12    Microsoft of doing here. Jensen v. Beaird, 40 Wash. App. 1, 696 P.2d 612 (1985). In

13    Jensen, the plaintiff and Defendant A agreed that Defendant A would pay the plaintiff a

14    certain sum, and in return, the plaintiff would pursue a claim against Defendant B and then

15    payback Defendant A out of any recovery. The court recited several policy considerations

16    in favor of these types of agreements. First, enforcing the agreement gave effect to the

17    parties' intent. Id. at 10. Second, this type of arrangement secures redress for the plaintiff

18    and provides for his immediate economic needs. The court stated,

19            We believe that the willingness of a tortfeasor to place a substantial sum of
               money at his victim's disposal, with the possibility of no recoupment, is
20            certainly to be encouraged, particularly from the view of the injured party
               whose receipt of redress might otherwise have to wait several years while
21            prolonged and varied court battles are waged.

22

23

24

25

26

---

[2] Judge Dore's statement is correct because RCW 9.12.010 (Washington's Barratry statute) removes concern about lawsuits being funded or pursued by those with no real interest for the sole purpose of harassing the defendant, the primary policy underpinning the doctrines of champerty and maintenance. The evils that the doctrines of champerty and maintenance were intended to suppress—speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position—are in modern times subject to more effective control by other means. 14 Am. Jur. 2d, Champerty, Maintenance, Etc. §1.

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 8
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

Id. Third, it encourages settlements. Id. ("'without the loan arrangement the settlement would not have occurred.'") (quoting Slaughter v. Pennsylvania X-ray Corp., 638 F.2d 639, 643 (3d Cir. 1981). Finally, it helps to simplify complex multiparty litigation. Id. Based upon these and other reasons, the Jensen Court rejected the application of champerty and maintenance to this type of provision. Id.

Similarly, enforcing the SLA would support the same policy considerations. It would give effect to the parties' intent to pay Microsoft in the event of a settlement with Sony; the Microsoft Settlement provided Immersion with the cash that it needed at the time of settlement; the payback provisions provided an incentive for Microsoft to settle with Immersion by providing an opportunity for Microsoft to recover some or all of the money that it paid to Immersion; and the Microsoft Settlement simplified the Sony Lawsuit, by eliminating Microsoft as a defendant.

2. **Even If The Champerty and Maintenance Doctrines Exist In Some Form Under Washington Law, The SLA Does Not Violate Them.**

Microsoft's actions do not constitute champerty and maintenance for several reasons. First, Microsoft was not a stranger to the Sony Lawsuit, one of the requirements of champerty. Joseph Mazzini Society v. Corgiat, 63 Wash. 273, 115 P. 93 (1911) (holding champerty does not apply where one is interested in the litigation); Giambattista, 21 Wash. App. at 735 (champerty or maintenance did not apply because the party was not a stranger to the litigation of another). Microsoft was a party to the Sony Lawsuit. As a result of the its settlement with Immersion, Microsoft also became a major shareholder of Immersion and thereby had a direct interest in the continuing Sony Lawsuit. Microsoft also acquired the right to sublicense Immersion's patents to third parties, including those that were the subject of the Sony Lawsuit.

Second, an agreement is not champertous if it does not affirmatively require the plaintiff to pursue the claim against another party. Jensen v. Beaird, 40 Wash. App. 1.

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 9
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    Immersion, not Microsoft, pursued its claims against Sony and the Microsoft Settlement,

2    including the SLA, did not require Immersion to pursue its claims against Sony. The

3    Microsoft Settlement did not provide Microsoft with any control over the strategy, tactics,

4    procedures, discovery, claims, arguments or trial of the Sony Lawsuit. Immersion even

5    admits that Microsoft did not have control or involvement over Immersion's litigation

6    against Sony. Viegas Dep., 64:7-18; Reutens Dep., 172:25-173:17, Ex. 62 and 63.

7    Immersion had the exclusive ability to decide how to conduct the litigation and whether or

8    not it would continue to pursue it.

9         Third, Immersion was not required to spend any of the money that Microsoft gave it

10   on the Sony Lawsuit, as contemplated by the doctrine of maintenance. There were no

11   restrictions on the $20 million paid for the license and sublicense. The $6 million that

12   Microsoft invested in Immersion was to be used for "general working capital purposes."

13   Ex. 8, sec. 1.3. Immersion deposited Microsoft's payments into its general fund, and did

14   not allocate it for legal expenses in the Sony Lawsuit. Viegas Dep., 48:14-49:1; 50:10-15,

15   Ex. 62. Immersion claims that it did not need Microsoft's money to pursue its claims

16   against Sony because it could have found the money from other sources. Id. Only the

17   separate Debenture Agreement designated that funds borrowed under that agreement to be

18   used in the Sony Lawsuit, but Immersion neither exercised the Debenture Agreement nor

19   borrowed any of this money. Ex. 7, sec. 2.03; Viegas Dep., 48:3-10.

20        Washington courts have routinely approved and enforced agreements that grant

21   parties even a direct, rather than indirect, interest in another's litigation, despite arguments

22   of champerty and maintenance. Weed, 58 Wash. at 677-78 (enforcing agreement between

23   attorney and client requiring client pay advanced costs, and stating that assignments of a

24   recovery arising out of an alleged tort are enforceable contracts); Monjay v. Evergreen

25   School District No. 114, 13 Wash. App. 654, 537 P.2d 825 (1975) (enforcing loan

26   agreement to fund litigation and taking a direct contingent interest in the litigation (citing

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 10
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  Clow v. National Indemnity Co., 54 Wash. 2d 198, 339 P.2d 82 (1959), and Bolton v.

2  Ziegler, 111 F. Supp. 516 (N.D. Iowa 1953)); Jensen v. Beaird, 40 Wash. App. 1, 696 P.2d

3  612 (1985). The mere fact that under the SLA Microsoft could recover some or all of its

4  payment to Immersion if Immersion settled with Sony also does not invalidate the

5  agreement. Immersion's likely recovery against Sony was Immersion's most valuable asset

6  at the time that Immersion and Microsoft entered into the SLA. It is logical that the parties

7  would agree that Microsoft would be paid back out of any settlement amount rather than

8  from other assets.

9        This Court should dismiss Immersion's invitation to apply the archaic, disfavored

10  and inapplicable doctrines of champerty and maintenance.

11  **B.**    **Frustration Of Purpose**

12        Immersion's third affirmative defense asserts that granting the relief sought by

13  Microsoft in this case would frustrate the purpose of the SLA. Washington has adopted the

14  doctrine of discharge by supervening frustration as set forth in the Restatement (Second) of

15  Contracts §265. See Felt v. McCarthy, 130 Wash. 2d 203, 207, 922 P.2d 90 (1996);

16  Washington State Hop Producers, Inc. v. Goschie Farms, Inc., 112 Wash. 2d 694, 700, 773

17  P.2d 70 (1989). "Where, after a contract is made, a party's principal purpose is

18  substantially frustrated without his fault by the occurrence of an event the non-occurrence

19  of which was a basic assumption on which the contract was made, his remaining duties to

20  render performance are discharged, unless the language or the circumstances indicate the

21  contrary." Restatement (Second) of Contracts §265 (1979); see also 29 Wash. Prac.,

22  Washington Elements of an Action §4:18 (2007-2008 ed.) (containing the Restatement

23  formulation of the doctrine). Frustration of purpose may be raised as an affirmative

24  defense when if the purpose is removed the transaction "would make little sense." Felt,

25  130 Wash. 2d at 208.

26

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    Immersion has not explained how the principal purpose of the SLA has been

2    somehow frustrated. Microsoft's Interrogatory Number 8 requests that Immersion

3    "[d]escribe with particularity the factual basis for" a number of affirmative defenses,

4    including frustration of purpose. Ex. 26 at 14. Immersion's answer is remarkably silent as

5    to its primary purpose of the contract, as required by the doctrine, much less how it was

6    frustrated, or how the transaction makes little sense without that purpose. See Felt, 130

7    Wash. 2d at 208. Immersion's answer to the interrogatory is also silent regarding "a fact of

8    which [Immersion] has no reason to know and the non-existence of which is a basic

9    assumption on which the contract is made," another essential element of the doctrine.

10   Restatement (Second) of Contracts §266(b).

11       The primary purposes of the Microsoft Settlement and the SLA are clear and

12   undisputed. First and foremost, the principle purpose was to settle Immersion's claims

13   against Microsoft. Viegas Dep., 38:22-25, Ex. 62 ("I don't recall any collusion to

14   accomplish anything other than the resolution of the dispute with Microsoft."). Secondary

15   purposes included providing substantial payments to Immersion from Microsoft, providing

16   a license to Microsoft to use Immersions' patents, providing Microsoft the right to

17   sublicense Immersion's patents to others, and providing Microsoft with an investment in

18   Immersion, and a right to participation in any settlement with Sony. Exs. 2, 5, 6, 7, and 8;

19   Viegas Dep., 44:5-45:25. It is undisputed that all of these purposes were accomplished,

20   except the last, which is at issue in this case.

21       If Immersion argues that there was another purpose that was not fulfilled to

22   Immersion's satisfaction, that failure will not invalidate the SLA or other related

23   agreements because the frustration must be substantial as to the primary purpose of the

24   agreement. Felt, 130 Wn.2d at 208. "It is not enough that the transaction has become less

25   profitable for the affected party or even that he will sustain a loss. The frustration must be

26   so severe that it is not fairly to be regarded as within the risks that he assumed under the

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    contract." Id. As stated above, most of the purposes of the SLA and related agreements

2    have been fulfilled, only the success of Immersion's defenses would frustrate any purpose

3    of the SLA.

4         Immersion has suggested that one of the purposes of the SLA was to allow

5    Microsoft to use its sublicensing rights to attempt to settle a separate lawsuit brought by

6    InterTrust Corporation, in which Sony held a minority ownership interest. However, the

7    SLA and other four agreements related to the Microsoft Settlement do not mention

8    InterTrust, that lawsuit or Sony's connection to it, much less that the Microsoft Settlement

9    was being entered into for the purpose of providing Microsoft with leverage to use in that

10   suit. Ex. 2. There are also no written communications between Microsoft and Immersion

11   mentioning this alleged purpose. Viegas Dep., 53:19-54:14. Immersion's numerous SEC

12   filings after the Microsoft Settlement do not mention the InterTrust lawsuit, even though

13   they do describe the material terms and purposes of the five agreements between Microsoft

14   and Immersion. Viegas Dep. 55:12-23. There is also no evidence that in its settlement

15   negotiations with InterTrust, Microsoft offered to sublicense Immersion's patents to

16   InterTrust or Sony. Viegas Dep., 60:4-15. The InterTrust lawsuit settled on its own terms

17   and Immersion continued to disclose its obligation to Microsoft in its many SEC filings

18   after the InterTrust lawsuit settled. Exs. 12-16. Use of the sublicensing rights in the

19   InterTrust suit could not have been the primary purpose of the SLA.

20        Even if one of the purposes of the SLA was to provide Microsoft with a bargaining

21   chip in negotiations with InterTrust, the fact that the sublicensing rights in section 2(a)

22   were never exercised at all, let alone for that purpose, in no way invalidates Immersion's

23   obligations to make payments to Microsoft under section 2(e) in the event that Immersion

24   and Sony settle the Sony Lawsuit. "The purpose that is frustrated must have been a

25   principal purpose of that party in making the contract." Felt, 130 Wn.2d at 208. The

26   repayment provision in section 2(e) of the SLA have purposes unrelated to any sublicense

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    that Microsoft might sell to Sony, including the payment of money by Immersion to

2    Microsoft. Indeed, section 2(e) does not come into play if Microsoft sublicenses to Sony.

3    Furthermore, Immersion does not assert that its principal purpose in entering into the SLA

4    was to give Microsoft this bargaining chip in an unrelated lawsuit, in which Immersion was

5    not a party nor had any interest in the outcome. It claims that this was one of Microsoft's

6    purposes, a fact which is disputed. Only if Immersion's main purpose of entering into the

7    agreement was frustrated could Immersion even begin to argue that it should be relieved of

8    its other obligations under the contract. Restatement (Second) of Contracts §265 (1979).

9        Even then, if other circumstances and language indicate to the contrary, the party's

10   whose purpose has been frustrated will not be relieved of its obligations. Id. Here, the

11   SLA provisions expressly state that the contract survives even if Microsoft did not

12   sublicense Sony. Sublicensing Sony was not required under the SLA. It was optional.

13   Microsoft had sublicensing rights for only 24 months. Ex. 2, sec. 2(c). However, the term

14   of the remainder of the agreement, including the payback provisions of section 2(e),

15   extended until the expiration of the License Patents (November 30, 2015 and October 24,

16   2011, Ex. 52 and 35 U.S.C. §154(a)(2)), and Immersion could not terminate the agreement

17   even if Microsoft breached the agreement (Ex. 2, sec. 6(a) and (b)). Section 2(e) explicitly

18   states that Immersion payment obligations to Microsoft extend beyond the 24 month period

19   for sublicensing. Immersions numerous SEC filings and correspondence after the

20   expiration of time for sublicensing continued to recognize the payment obligations to

21   Microsoft. When entering into the contract and well after the 24 month period, Immersion

22   expected that the contract, along with its remaining obligations, would survive Microsoft's

23   decision not to sublicense Sony.

24        Accordingly, frustration of purpose is inapplicable and Microsoft requests that the

25   Court grant summary judgment on Immersion's third affirmative defense.

26

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 14
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

**C.     Illegality**

In its fifth affirmative defense, Immersion claims "[t]he provisions of the Sublicense Agreement under which Microsoft purports to seek relief in this action are void and unenforceable for illegality, if Microsoft's interpretation of such provisions is adopted."

It is well-settled that parties to a contract may incorporate into it any provision that is not illegal. Car Wash Enterprises, Inc. v. Kampanos, 74 Wash. App. 537, 543, 874 P.2d 868 (1994); Redford v. City of Seattle, 94 Wash. 2d 198, 206, 615 P.2d 1285 (1980); Coast Sash & Door Co. v. Strom Constr. Co., 65 Wash. 2d 279, 281, 396 P.2d 803 (1964). Accordingly, courts will uphold whatever lawful agreement parties make with each other. Redford, 94 Wash. 2d at 206 (citing Dix Steel Co. v. Miles Const., Inc., 74 Wash. 2d 114, 443 P.2d 532 (1968)).[3]  Summary judgment is appropriate on Immersion's illegality defense because none of the provisions in the SLA are illegal.

Only "[c]ontract terms that conflict with the terms of a legislative enactment are illegal and unenforceable." Nelson v. McGoldrick, 127 Wn.2d 124, 138, 896 P.2d 1258 (1995) (citation omitted).  Immersion cannot identify any statute that is violated by any provision of the SLA.  There is no statute or other law prohibiting private parties from entering into agreements to settle a case, license or sublicense patent rights, enter into a sharholder agreement, or agree to scaled payments based upon possible contingencies, including settlements of various amounts.  More importantly, no statute or case law prohibits the parties from contracting for payments that would be made from a potential

---

[3]  Unlike other substantive areas of contract, Washington adopted the approach of the Restatement (First) of Contracts, and not the Restatement (Second) of Contracts, to illegal contracts.  See State v. Northwest Magnesite Co., 28 Wn.2d 1, 26, 182 P.2d 643 (1947) (citing to Restatement (First) of Contracts).  The Restatement (Second) of Contracts groups illegality under the violation of public policy defense and employs a test that involves balancing the parties' interests to determine whether the contract will be considered void or unenforceable.  See Restatement (Second) of Contracts §178 (1981).  Washington law typically addresses illegal contracts more directly.

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    future recovery against another party in the continuing lawsuit. To the contrary,

2    Washington Courts have approved such arrangements and found them to be beneficial.

3    See, e.g. Jensen, 40 Wn. App. 10.

4    Accordingly, the SLA is not void based upon the illegality doctrine. See Car Wash,

5    74 Wash. App. at 544 (stating that "[i]n the absence of express statutory language

6    evidencing a legislative intent to prohibit agreements in which private parties allocate the

7    risk of MTCA liability between themselves, we conclude that such agreements are not

8    prohibited under the MTCA"); see also Redford, 94 Wash. 2d at 206-07 (indemnity

9    contract was enforceable because no statute barred such agreement); State v. Northwest

10    Magnesite Co., 28 Wash. 2d 1, 26, 182 P.2d 643 (1947).[4]

11    The Court should grant summary judgment dismissing Immersion's affirmative

12    defense of illegality because no statute prohibits the parties from agreeing to any of the

13    provisions in the SLA.

14    **D.    Violation Of Public Policy**

15    In its sixth affirmative defense, Immersion asserts the SLA discouraged settlement

16    between Sony and Immersion, and is therefore void and unenforceable as being against the

17    public policy of encouraging settlements. Immersion's argument is that the effect of the

18    payment provision rendered settlement with Sony more difficult. This argument has no

19    basis in Washington law or in fact.

20

21

22

23

---

[4] To the extent Immersion is arguing that the Sublicense Agreement changes the effect of common law, these
24   contracts are not considered illegal. See, e.g., Coast Sash, 65 Wn.2d at 281-82 (holding that it is not illegal
for parties to contract the conditions upon which damages will be assessed for failure to perform). This is
25   because "parties often contract so that they, and not the common law, control the legal effect that will flow
from an anticipated set of circumstances." 25 Wash. Practice, Contract Law And Practice §7.1 (2007
26   Update).

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1. **The SLA Does Not Violate Any Public Policy Expressed In A Statute Or Common Law.**

Washington courts will not invoke a public policy to override an otherwise proper contract even though the terms of the contract may be harsh and the necessity of such terms are doubtful. Bohme v. PEMCO Mut. Ins. Co., 127 Wash. 2d 409, 899 P.2d 787 (1995). A party may incorporate into a contract any provision that is not against public policy. Car Wash Enterprises, Inc. v. Kampanos, 74 Wash. App. 537, 874 P.2d 868 (1994). Generally, a contract which is not prohibited by statute, condemned by judicial decision, or contrary to the public morals, contravenes no public policy. State Farm General Ins. Co. v. Emerson, 102 Wash. 2d 477, 687 P.2d 1139 (1984); Brown v. Snohomish County Physicians Corp., 120 Wash. 2d 747, 753, 845 P.2d 334 (1993). Washington courts do not invoke public policy to confine or avert express contract terms where there is no legislative action. 25 Wash. Prac., Contract Law and Practice §7.4 (1998) (citing Brown, 120 Wash. 2d at 753; Cary v. Allstate Ins. Co., 130 Wash. 2d 335, 340, 922 P.2d 1335 (1996)).

The SLA and its provision for payments to Microsoft in the event of a settlement between Immersion and Sony were part of a business arrangement the parties used to settle their litigation. There is no express statutory language evidencing a legislative intent to prohibit private parties entering into business agreements to settle a case. In particular, no statute prohibits parties from contracting for payments that would be made from a potential future recovery against a third party. To the contrary, Washington courts have approved such arrangements and found them to have public policy benefits. See, e.g., Jensen, 40 Wash. App. 10.

Indeed, no law exists holding that a settlement agreement violates public policy where its terms could have a tendency to make the plaintiff want to settle its claims against the remaining defendant(s) for a higher number. Such a policy would render all contingent fee agreements void, which would be contrary to Washington law. See, e.g., Weed, 58

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1    Wn. at 677-78 (enforcing agreement between attorney and client requiring client pay

2    advanced costs); <u>Monjay v. Evergreen School District No. 114</u>, 13 Wn. App. 654, 537 P.2d

3    825 (1975) (enforcing loan agreement to fund litigation and taking a direct contingent

4    interest in the litigation).

5        In a multi-defendant case, as existed in the Sony Lawsuit, all settlements between

6    the plaintiff and one defendant will have a potential effect on later settlements with other

7    defendants in the same case. Just considering the amount of the settlement, without

8    considering other party obligations, impacts the willingness and ability of the plaintiff to

9    settle with the second defendant. The amount of the first settlement influences the

10    plaintiff's future settlement valuation, and may operate to inhibit settlement with the

11    remaining defendants if the plaintiff has a combined target number as its value of all

12    combined settlements. Invalidating a contractual term merely because it could impact a

13    future settlement with another defendant would destroy the courts' stated goal favoring

14    settlements and would operate to cast doubt on all settlements in multi-party litigation.

15        Enforcing the SLA furthers the public policy regarding the parties' ability to resolve

16    their disputes through settlement. Consequently, the parties' settlement deal should not be

17    disturbed. <u>See</u>, <u>e.g.</u>, <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535 (10th Cir. 1993); <u>Andes v.</u>

18    <u>Albano</u>, 853 S.W.2d 936 (Mo. 1993). By contrast, allowing Immersion to render the

19    parties' settlement arrangement unenforceable will have the counterproductive result of

20    chilling all future settlements based upon uncertainty whether the parties' contractual

21    obligations in settlement will be valid and enforceable.

22        For all of these reasons, Microsoft is entitled to summary judgment as a matter of

23    law on Immersion's violation of public policy affirmative defense.

24      **2.**     <u>**The SLA Did Not Prevent Settlement Of The Sony Lawsuit.**</u>

25        Not only is Immersion's public policy affirmative defense legally deficient, but its

26    factual premises are flawed. Immersion argues that the SLA provisions discouraged a

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  settlement between Immersion and Sony. However, between the commencement of the

2  Sony Lawsuit in 2002 and in late 2006, Immersion and Sony were very far apart in their

3  settlement positions – between 80 and well over 100 million apart. Viegas Dep. 180:9-

4  197:14, Birnholz Dep. 93:9-25, 94:13-16, 95:3-96:1, Liu Dep., 26:8-27:10 Ex. 62 and 69,

5  and 67. The payback provisions in the SLA could not have prevented their settlement.

6       After the verdict in the Sony Lawsuit, Sony and Immersion did in fact engaged in

7  settlement negotiations, reached agreement on the material terms of a settlement during

8  those negotiations, and settled the Sony Litigation.. See Microsoft's Motion for Partial

9  Summary Judgment on Breach of Contract. Sony settled with Immersion by making

10 combined payments of approximately $150 million and amount far in excess of what

11 Immersion owes Microsoft..

12      Invalidating the SLA because it allegedly discouraged Immersion from settling with

13 Sony on certain terms will not change what happened between Sony and Immersion. Far

14 from the stated goal of implementing public policy, to the only result will be that

15 Immersion will retain more money from its agreements with and payments from Sony.

16      The SLA does not violate any public policy. Microsoft is entitled to judgment as a

17 matter of law.

18 **E.    Unclean Hands**

19      In its seventh affirmative defense, Immersion asserts the doctrine of "unclean

20 hands." Immersion alleges that "Microsoft's intermeddling in and misuse of third parties'

21 litigation against Microsoft competitors is an example of how Microsoft comes to this

22 Court with unclean hands." Ex. 26 at 17. This defense must be dismissed as a matter of

23 law and undisputed fact. First, unclean hands is an equitable defense that is not available

24 to Immersion as a matter of law because in this lawsuit Microsoft seeks only monetary

25 damages. Second, there is no evidence that Microsoft "intermeddled" in Immersion's

26 continuing lawsuit against Sony.

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 19
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1.  **The Equitable Defense Of Unclean Hands Does Not Apply To Microsoft's Action At Law For Damages.**

Microsoft's cause of action in this case is breach of contract and Microsoft seeks only monetary damages. Because Microsoft has not brought an action in equity, the doctrine of unclean hands, an equitable defense, is unavailable in this case. See generally J. L. Cooper & Co., 9 Wash. 2d at 71 (Unclean hands is an equitable doctrine that is a defense to requested equitable relief.); Income Investors, 3 Wash. 2d at 602; see also 15 Wash. Prac., Civil Procedure §44.16 (providing that the "[r]ule disqualifies a plaintiff from obtaining equitable relief . . ."). The doctrine of unclean hands applies, for example, to an equitable claim for specific performance. See, e.g., Crafts v. Pitts, 161 Wash. 2d 16, 24, n.4, 162 P.3d 382 (2007) (providing that the "well-known equitable defenses of estoppel, laches, and unclean hands are available to any defendant against whom performance is sought.").

No Washington case has applied the unclean hands doctrine to a breach of contract case seeking damages. The Washington Supreme Court, in Cascade Timber Co. v. Northern Pac. Ry. Co., 28 Wash. 2d 684, 712, 184 P.2d 90 (1947), drew an explicit distinction between the application of the doctrine to an equitable claim for specific performance and a legal claim for damages, stating as follows:

> The remedy of specific performance is an equitable remedy governed by equitable principles; equity will not decree specific performance of an inequitable contract or an unconscionable bargain, but will leave the party to his remedy at law. It will not grant such relief when it would be contrary to equity and justice to do so. One coming to a court of equity for specific performance must show that there is equity and good conscience in support of his claim to relief. He must come into the court with clean hands, and seeking an equitable remedy, he must himself to do equity.

Cascade Timber, 28 Wash. 2d at 712 (quoting 49 Am. Jur. 10, §6) (emphasis added).

Accordingly, in breach of contract actions, Washington courts have applied the unclean hands doctrine only when equitable relief is sought. See, e.g., Portion Pack, Inc. v. Bond, 44 Wash. 2d 161, 265 P.2d 1045 (1954) (injunction); Cascade Timber Co. v.

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  Northern Pac. Ry. Co., 28 Wash. 2d 684, 712, 184 P.2d 90 (1947) (specific performance);

2  Income Investors v. Shelton, 3 Wash. 2d 599, 101 P.2d 973 (1940) (accounting);

3  Kramarevcky v. Dept. of Social and Health Servs., 122 Wash. 2d , 738, 743 n.1, 863 P.2d

4  535 (estoppel); see also 25 Wash. Prac., Contract Law and Practice §15.2 (2007); 3

5  Restatement (Second) of Contracts §357 cmt. c (1979).[5]

6      Microsoft is entitled to partial summary judgment on this defense because the

7  unclean hands doctrine is not an affirmative defense to Microsoft's legal claim for damages

8  for breach of the SLA.

9      **2.    Immersion Makes No Allegation That Would Constitute "Unclean**
       **Hands."**

10     The doctrine of "unclean hands" is rooted in the basic equitable principle that

11 "equity will not interfere on behalf of a party whose conduct in connection with the subject

12 matter or transaction in litigation has been unconscientious, unjust, or marked by the want

13 of good faith, and will not afford him a remedy." Income Investors, Inc. v. Shelton, 3

14 Wash. 2d 599, 602, 101 P.2d 973 (1940); see Precision Instrument Mfg. Co. v. Automotive

15 Maintenance Mach. Co., 324 U.S. 806, 814 (1945).  The type of act or omission that

16

17 _____

18 [5] Limiting unclean hands to equitable causes for relief is the rule in several other jurisdictions, and appears to
   be the majority rule.  See, e.g., Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 449 (1935) (providing
   that no matter how strong an equitable claim is, equity cannot grant relief if a party will be deprived of a legal
19 right); Union Electric Company v. Southwestern Bell Telephone, L.P., 378 F.3d 781, 788 (8th Cir. 2004)
   (Missouri law) ("[t]he 'clean hands' doctrine does not bar a claim for money damages"); Kraus v. Harder,
20 2004 WL 716576, *6 (D. Or. 2004) (Oregon law) ("any unclean-hands defense would appear to bar only his
   claims for equitable relief (such as his claims for an accounting and a constructive trust) but not his fiduciary
21 duty claims to the extent the claims seek damages"); Truitt v. Miller, 407 A.2d 1073, 1079-80 (D.C. App.
   1979) (unclean hands has "no applicability in an action for damages"); Kaiser v. Market Square Discount
22 Liquors, Inc., 992 P.2d 636, 641 (Colo. App. 1999) ("[t]he clean hands doctrine can be used only as a
   defense to a claim in equity, not to a claim at law"); Holmes v. Henderson, 274 Ga. 8, 8-9, 549 S.E.2d 81
23 (2001) ("The equitable doctrine of unclean hands, however, has no application to an action at law");
   American Nat'l Bank & Trust v. Levy, 83 Ill. App. 3d 933, 948, 404 N.E. 2d 946 (1980)("[e]ven though the
24 contract itself cannot be cancelled, equity will not interfere with an action at law for its breach") (citing
   McClintock, Equity §26, at 62 (2d ed. 1948)); Merchants Indem. Corp. v. Eggleston, 37 N.J. 114, 132, 179
25 A.2d 505 (1962) (doctrine of unclean hands "operates to deny a suitor the special remedies of equity, leaving
   him his remedies at law."); Fremont Homes, Inc. v. Elmer, 974 P.2d 952, 959 (Wyo. 1999) ("the unclean
26 hands doctrine does not apply to the legal remedy sought").

precludes a party from obtaining equitable relief under the doctrine of unclean hands must have "an immediate and necessary relation to the equity for which he sues." J.L. Cooper & Co. v. Anchor Sec. Co., 9 Wash. 2d 45, 73, 113 P.2d 845 (1941). And, "[i]t must be understood to be willful misconduct in regard to the matter in litigation." Cooper, 9 Wash. 2d at 73; see Portion Pack, Inc. v. Bond, 44 Wash. 2d 161, 170, 265 P.2d 1065 (1954) (the misconduct must be related directly to the transaction or situation at issue); Kramarevcky v. Department of Social & Health Serv., 122 Wash. 2d 738, 743 n. 1, 863 P.2d 535 (1993) (citing Mutual of Enumclaw Ins. Co. v. Cox, 110 Wash. 2d 643, 651, 757 P.2d 499 (1988)) (providing that a court will not grant equitable relief to a party that is at fault in the transaction at issue); see also Flow Control Indus., Inc. v. AMHI, Inc., 278 F. Supp. 2d 1193 (W.D. Wash. 2003). The clean hands doctrine "does not repel all sinners from courts of equity." Cooper, 9 Wash. 2d at 73 (citing 1 Story's Equity Jurisprudence §§98, 100, 102 (14th ed.)).

To support an unclean hands defense, Immersion must make allegations of specific inequitable conduct in connection with the transaction at issue. Cooper, 9 Wash. 2d at 73, Portion Pack, 44 Wash. 2d at 170. As a matter of law, "[f]raud or inequity practiced against a third person . . . does not close the doors of equity to a plaintiff guilty of no inequity as against a defendant." McKelvie v. Hackney, 58 Wash. 2d 23, 31-32, 360 P.2d 746 (1961). Microsoft's agreement with Immersion to settle the lawsuit through the SLA and related agreements was not unconscientious, unjust, or marked by the want of good faith. Immersion has not alleged that Microsoft engaged in fraud or that it made false representations in connection with the SLA or that it otherwise negotiated in bad faith. Cooper, 9 Wash. 2d at 74 (requiring that the plaintiff must be "guilty of a fraud which tends to produce the injury of which he seeks redress."); Langley v. Devlin, 95 Wash. 171, 186-87, 163 P. 395 (1917) (describing unclean hands as "he who has defrauded his

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 22
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  adversary to his injury in subject matter of action will not be heard to assert a right in

2  equity").

3      The Microsoft Settlement negotiations were conducted in good faith and at arms

4  length. Immersion and Microsoft negotiated to resolve their dispute, bargained hard, and

5  were represented by legal counsel. In fact, both parties thoroughly reviewed and revised

6  the Microsoft Settlement documents. Negotiations and drafting took place over several

7  weeks, with many drafts of the agreements exchanged between the parties and their

8  attorneys. No procedural improprieties existed regarding the SLA's negotiation and

9  execution. In fact, Immersion has not alleged or otherwise argued that Microsoft is guilty

10 of any inequity against Immersion during the negotiation, execution, or performance of the

11 SLA and related settlement agreements. Ex. 26, at 17. Viegas Dep., 38:7-25 (describing

12 negotiations as professional, arms-length, and in good faith).

13     Immersion fails to fulfill its burden of putting forth conduct that has infected

14 Microsoft's breach of contract cause of action, "so that to entertain it would be violative of

15 conscience." Cooper, 9 Wash. 2d at 74. Microsoft has fulfilled its obligations under the

16 settlement agreements, including the SLA. Accordingly, Microsoft requests summary

17 judgment on Immersion's unclean hands affirmative defense.

18 **G.    Unjust Enrichment**

19     In its eighth affirmative defense, Immersion asserts that Microsoft's claims are

20 "barred in whole or in part because it seeks relief from Immersion that, if granted, would

21 result in unjust enrichment to Microsoft." Immersion argues that its unjust enrichment

22 defense is based upon "Microsoft's apparent interpretation of the Sublicense Agreement as

23 providing Microsoft with an unlimited, perpetual right to a share in Immersion's judgment

24 and other court-awarded recovery from Sony." Ex. 26, 16-17.

25     Unjust enrichment is an implied contract theory. Unjust enrichment occurs when

26 one retains money or benefits which in justice and equity belong to another. Bailie

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 23
4825-6346-6242.08
062608/1330/20363.00411

Communications, Ltd. v. Trend Business Sys., 61 Wash. App. 151, 159, 810 P.2d 12
(1991). The law only recognizes unjust enrichment as an affirmative quasi-contract claim
to allow restitution for a benefit conferred. See Restatement (Second) Contracts §345(c)
and (d) (restoring a parties restitution interest, allowing judicial remedies for breach of
contract as requiring restoration of a specific thing or awarding a sum of money to prevent
unjust enrichment); see also 1 Corbin on Contracts §1.20 (2007 & 2007 Supp.) (defining
terms); John Edward Murray, Murray on Contracts, §§20, 126B.1 (4th ed. 2001)
(explaining unjust enrichment); Samuel Williston, A Treatise on the Law of Contracts,
§68.5 (Robert A. Lord 4th ed. 2003) (unjust enrichment is quasi contractual recovery). The
doctrine of unjust enrichment was created in an effort to allow recovery when a benefit has
been conferred on another without an express, written, contractual obligation. Cf. Bailie,
61 Wash. App. at 159 (applying unjust enrichment as an implied contract theory).

But here the parties had an express, written contract. Enforcement of a written
executed contract is not unjust enrichment by definition. There is no implied contract at
issue. Accordingly, the doctrine of unjust enrichment is not applicable.

Additionally, Immersion cannot meet the three elements of unjust enrichment: (1) a
benefit conferred upon Microsoft by Immersion; (2) an appreciation or knowledge by
Microsoft of the benefit; and (3) the acceptance or retention by Microsoft of the benefit
under such circumstances as to make it inequitable for the defendant to retain the benefit
without the payment of its value. Bailie, 61 Wash. App. at 159-60.

Immersion cannot demonstrate the first element of unjust enrichment because
Immersion has not conferred a benefit to Microsoft for which Immersion is seeking a
return. It is axiomatic that a benefit must be conferred before unjust enrichment can apply.
To the contrary, Immersion is refusing to confer the "benefit" at issue here—the payment
that it is obligated to make under the SLA. Immersion's affirmative defense is premised on
the court or jury ruling in Microsoft's favor and awarding damages for breach of contract.

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1   Ex. 26, at 14-17. However, if the court awarded Microsoft damages on its breach of

2   contract claim, it would be the court, not Immersion, that conferred the "benefit" to

3   Microsoft. Therefore, the first element of Immersion's unjust enrichment theory cannot be

4   met, and it demonstrates that unjust enrichment is not applicable to Microsoft's claim.

5          The third element of an unjust enrichment claim is that it would be inequitable for

6   Microsoft to retain the benefit without payment of the benefit's value. See Bailie, 61

7   Wash. App. at 159-60. In other words, enrichment alone does not suffice; the proponent of

8   the doctrine must show that the enrichment was "unjust." Farwest Steel Corp. v. Mainline

9   Metal Works, Inc., 48 Wash. App. 719, 732, 741 P.2d 58 (1987). A court award of

10  damages to Microsoft for Immersion's breach of contract is not inequitable. The payment

11  would be "just" by definition because it would be for the court's enforcement of the

12  parties' express written agreement. Goel v. Jain, 259 F. Supp. 2d 1128, 1139 (2003).

13         Unjust enrichment is not applicable as an affirmative defense in this case.

14  Accordingly, summary judgment is appropriate.

15  **H.      Unconscionability**

16         In its ninth affirmative defense, Immersion asserts that the relief sought by

17  Microsoft, if granted, would render the SLA unconscionable. Immersion argues that

18  Microsoft is not entitled to the "windfall" it seeks in this lawsuit, and that "an unlimited,

19  perpetual right to a share in Immersion's judgment and other court-awarded recovery from

20  Sony renders the Sublicense Agreement unconscionable." Ex. 26, at 16.

21         There are two types of unconscionability—substantive and procedural. See Nelson,

22  127 Wash. 2d at 131. The burden of proving that a contract or contract clause is

23  unconscionable lies with the party attacking it. American Nursery Prods., Inc. v. Indian

24  Wells Orchards, 115 Wash. 2d 217, 222, 797 P.2d 477 (1990) (en banc). The issue of

25  unconscionability is a question of law for the court, not an issue of fact for the jury.

26

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 25
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

Nelson v. McGoldrick, 127 Wash. 2d 124, 131, 896 P.2d 1258 (1995). Accordingly, summary judgment regarding Immersion's unconscionability defense is appropriate.

1.   **Immersion Cannot Demonstrate Procedural Unconscionability.**

"Procedural unconscionability is 'the lack of meaningful choice, considering all the circumstances surrounding the transaction. . . .'" Nelson, 127 Wash. 2d at 131. Procedural unconscionability may also involve "impropriety during the process of forming a contract." See Schroeder v. Fageol Motors, Inc., 86 Wash. 2d 256, 260, 544 P.2d 20 (1975).[6]

In determining whether procedural unconscionability exists, a court will consider all the circumstances surrounding the transaction, examining the following three specific factors:

(1) the manner in which the contract was entered;

(2) whether each party had a reasonable opportunity to understand the terms of the contract; and

(3) whether the important terms were hidden in a maze of fine print.

Id. (citing Williams v. Walker Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965)); American Nursery, 115 Wash. 2d at 222. The undisputed evidence demonstrates that Immersion made a well-informed, meaningful choice when it entered into the Microsoft Settlement.

a.   Manner In Which The Contract Was Entered.

In considering the manner in which the contract was entered, Washington courts focus on the behavior and circumstances of the contracting parties, particularly a party's lack of bargaining power, the opposing party's refusal to respond to the party's questions or concerns, and any undue pressure placed on the party raising the unconscionability defense.

---

[6] Although Schroeder arose under the Uniform Commercial Code, the court's general exposition on unconscionability is applicable beyond the UCC. Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 391, 858 P.2d 245 (1993) (en banc).

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

See, e.g., Nelson, 127 Wash. 2d at 136 (noting that, along with other factors, the pressure the heir-hunter placed on the defendant to sign the contract raises the possibility that the agreement was unconscionable); Adler v. Fred Lind Manor, 153 Wash. 2d 331, 103 P.3d 773 (2004) (remanding case for further proceedings to determine whether employer threatened to fire the plaintiff-employee for refusing to sign the agreement despite the fact that the plaintiff-employee raised concerns with the agreement's terms or indicated a lack of understanding).

The Microsoft Settlement did not involve a series of adhesion contracts. Two sophisticated entities bargained at arms-length to resolve their dispute. Viegas Dep., 39: 1-7, 41 7-11, 41:17-42:20; and Exs. 59 and 60. Both parties were represented by sophisticated business employees and highly skilled in-house and outside counsel. Id.; Reutens Dep., 7:23-8:7, 8:16-9:16, 14:13-17, 54:10-55:17, Ex. 63. See Nelson, 127 Wash. 2d at 136. Negotiations and drafting took place over several weeks, and the parties exchanged many draft agreements. McGrath Decl.; Ex. 60; Reutens Dep. 43:25-45:8; Birnholz Dep. 56:2-20; 61:2-23, 62:14-68:23, Exs. 63 and 69. See Brown, 92 Wash. App. at 601 ("The agreement was the result of extensive negotiation and was revised several times by both parties."). Immersion was not forced into the SLA. Immersion held significant bargaining power through its patent lawsuit, which threatened Microsoft with a large judgment and potential injunction. Immersion Complaint, Ex. 3. Immersion admits that it was not under duress at the time it signed the agreement and claims that it did not need Microsoft's money to stay in business and fund the Sony Lawsuit. Viegas Dep., 44:1-3; 49:13-50. It had other sources of money. Id. Neither party was unfairly surprised. American Nursery, 115 Wash. 2d at 225 (noting that both parties, in an arms-length transaction, negotiated and entered into the contract with no indicia of unfair surprise.)

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 27
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

b.  Reasonable Opportunity To Understand The Terms.

When analyzing whether a party had a reasonable opportunity to understand the terms of the agreement, Washington courts have frequently noted the amount of time the party had to consider the contract. Zuver, 153 Wash. 2d at 306 (focusing upon no demand for return of agreement); see also Luna v. Household Finance Corp., 236 F. Supp. 2d 1166 (W.D. Wash. 2002) (focusing on rescission period).

Immersion had more than adequate opportunity to understand the agreements. The parties discussed, negotiated and drafted the settlement agreements over several weeks, a time period that is more than adequate for review and understanding under Washington law. Zuver, 153 Wash. 2d at 306 (holding arbitration agreement was not procedurally unconscionable when the company did not demand the plaintiff immediately return the agreement); Adler, 153 Wash. 2d at 349 (holding a week was sufficient); American Nursery, 115 Wash. 2d at 225 (holding that a month and a half—the time between "sometime in December 1983" and January 18, 1984—was sufficient); see also Luna, 236 F. Supp. 2d at 1176 (holding three day rescission period provided parties with a reasonable period of time to consider contract's terms); cf. Nelson, 127 Wash. 2d at 136 ("There is no indication in the record that [the defendant] lacked adequate time to study and understand the agreement.").

Immersion admits that it understood the terms of the agreements. Viegas Dep., 43:22-25, Reutens Dep. 159:4-160:2, Ex. 62, 63. Further proof that Immersion fully understood the terms of the SLA can be found its SEC filing after the Microsoft Settlement, in which Immersion described its agreements with Microsoft, including the payback obligations under Section 2(e) of the SLA, in detail. Ex. 12-16.

c.  Maze Of Fine Print.

The "fine print" inquiry is characterized as a question of whether "the terms of the agreement were set forth in such a way that an average person could not understand them."

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 28
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  <u>Zuver</u>, 153 Wash. 2d at 307. Even when a contractual provision is more complex than an

2  average consumer is likely to encounter in day-to-day reading, an agreement term will not

3  be considered unconscionable if written plainly and is unlikely to confuse a reasonably

4  attentive lay reader. <u>Luna</u>, 236 F. Supp. 2d at 1175-76.

5      Courts will consider the size of the print along with the length of the contract, the

6  typeface and font, the use of capitalization, and the use of labeling. <u>See</u>, <u>e.g.</u>, <u>Zuver</u>, 153

7  Wash. 2d at 306 (focusing on label on contract, typeface and font, and length of contract);

8  <u>Luna</u>, 236 F. Supp. 2d at 1176 (focusing on newspaper size typeface). "Small printing

9  alone does not render a standard agreement unconscionable." <u>Planet Ins. Co. v. Wong</u>, 74

10  Wash. App. 905, 915, 877 P.2d 198 (1994).

11      Immersion has made no allegation that any of the terms in the carefully negotiated

12  Microsoft Settlement Agreements are buried in fine print in a form contact. They are

13  clearly visible, in a normal typeface. Immersion admits that it read and participated in

14  drafting the relevant provisions. Ex. 60; Reutens Dep. 159:17-160:2, Ex. 63. This element

15  cannot be meet where, as here, the complaining party read and participated in the drafting

16  of the disputed provision.

17      In summary, Immersion cannot claim that any of the agreements between Microsoft

18  and Immersion, including the SLA, are procedurally unconscionable . Two sophisticated

19  business entities represented by counsel negotiated, reviewed, and revised these agreements

20  over several weeks, and then chose to execute those agreements. Microsoft is entitled to

21  summary judgment on procedural unconscionability as a matter of law.

22      **2.    The Microsoft Settlement Is Not Substantively Unconscionable.**

23      "Substantive unconscionability involves those cases where a clause or terms in the

24  contract is alleged to be one-sided or overly harsh." <u>Zuver v. Airtouch Communications,</u>

25  <u>Inc.</u>, 153 Wash. 2d 293, 303, 103 P.3d 753 (2004) (quoting <u>Nelson</u>, 127 Wash. 2d at 131).

26  "Substantive unconscionability will appear in the contract itself." 25 Wash. Prac., <u>Contract</u>

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

Law and Practice §9.5. "It concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." Southwest Pet Prods., Inc. v. Koch Indus., Inc., 107 F. Supp. 2d 1108, 1113 (D. Ariz. 2000).

> a. Substantive Unconscionability Does Not Guard Against Businesses Entering Into Bad Bargains.

Courts will not relieve a party of a bad bargain as long as he or she is competent to contract, unless the consideration is so inadequate as to constitute constructive fraud. Rogich v. Dressel, 45 Wash. 2d 829, 843, 278 P.2d 367 (1954). Courts cannot relieve parties of their bad bargains merely because they are bad bargains. Howland v. Day, 125 Wash. 480, 216 P. 864 (1923). "Inadequacy of price does not mean an honest difference of opinion as to price, but a consideration so far short of the real value of the property as to startle the correct mind." McGhee v. Wells, 35 S.E. 529 (S.C. 1900). "If written instruments deliberately signed by parties with knowledge of their terms and conditions can be disregarded by them, then it is futile to execute them." Id. "Where the consideration is legally sufficient, the courts are loath to inquire into its 'adequacy,' that is, into the comparative value of the promises and acts exchanged." Browning v. Johnson, 70 Wash. 2d 145, 147, 422 P.2d 314 (1967); Meyer v. Eschbach, 192 Wash. 310, 316, 73 P.2d 803 (1937).

The business nature of a contract, as well as the status of a party as sophisticated businessman or neophyte, are among the factors a court must consider in deciding the unconscionability question. See Schroeder v. Fageol Motors, Inc., 86 Wash. 2d 256, 259, 544 P.2d 20 (1975). "The root of the matter is that where a commercial contract is concerned, the parties often fairly share bargaining strength, sophistication about contract terms relevant to the commercial enterprise involved, and the knowledge and skill required for a contract fairly allocating risks." American Nursery, 115 Wash. 2d at 225 (1990) (dissent). Thus, there is generally greater reluctance to finding a commercial contract

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 30
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams p.s.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1   unconscionable. Id.; Jones Leasing, Inc. v. Gene Phillips and Associates, 282 S.C. 327,

2   318 S.E.2d 31, 33 (S.C. App. 1984) ("[c]ontract terms are not generally found to be

3   unconscionable in contracts which have been negotiated at arms-length between two

4   sophisticated parties such as the corporate entities represented herein."); Lewis

5   Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 709 F.2d 427, 431 (6th

6   Cir. 1983) ("numerous decisions have pointed out [that] unconscionability rarely exists

7   unless the buyer is a consumer")(collecting cases).

8           It is undisputed that when entering the Microsoft Settlement, both parties were

9   sophisticated corporate entities that carefully evaluated the circumstances and determined

10  that it was a good deal for each of them. Any dissatisfaction that Immersion now feels

11  does not invalidate the contract.

12                  b.      SLA Section 2.(e). Does Not Violate The Reasonable Expectations
                            Of Immersion.
13
            To be unconscionable, the contract or term must violate the reasonable expectations
14
    of the parties. 25 Wash. Prac., Contract Law and Practice §9.5. Immersion knew and
15
    understood the payback provision, as the contracts were carefully negotiated and reviewed
16
    by experienced business people and counsel. Immersion's quarterly Form 10-Qs and its
17
    annual Form 10-Ks, reviewed by several Immersion lawyers and sworn to by its CEO and
18
    CFO, repeatedly recognized its obligation to pay Microsoft if Immersion settled with Sony.
19
    In those statements, Immersion recognized its continuing obligation to Microsoft. For
20
    example, in its December 31, 2005 10-Q, Immersion states:
21
            [I]n the event that the Company [Immersion] settles its lawsuit with Sony
22          Computer Entertainment, the Company will still be obligated to pay certain
            sums to Microsoft as described in Note 8 [which describes section 2(e)'s
23          payback obligations].

24  Exs. 13. This evidence demonstrates that Section 2.e. of the SLA did not violate the

25  reasonable expectations of Immersion and summary judgment is appropriate.

26

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

c.    The Parties' Bargain Was Not Shocking to the Conscience.

"'Shocking to the conscience,' 'monstrously harsh,' and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability." See Nelson v. McGoldrick, 127 Wash. 2d 124, 131, 896 P.2d 1258 (1995). An often quoted British case from 1750 states, "An unconscionable bargain is one in which no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other." Earl of Chesterfield v. Janssen, 2 Ves. Sen. 125, 155, 28 Eng. Rep. 82, 100 (1750) (quoted in Doctor's Assoc., Inc. v. Jabush, 89 F.3d 109, 113 (2d Cir. 1996), and in Hume v. United States, 132 U.S. 406, 411, 10 S. Ct. 134, 136 (1889)). Only where the purchase price is so "grossly inadequate as to shock the conscience of an equity court . . . [will] inadequacy of consideration may be sufficient to avoid a conveyance." Downing v. State, 9 Wash. 2d 685, 688-89, 115 P.2d 972 (1941) (citing Sherman v. Glick, 71 Or. 451, 142 P. 606 (Or. 1914)); see also Nelson v. Nelson, 57 Wash. 2d 321, 323-24, 356 P.2d 730 (1960).

Washington courts "evaluate unconscionability as of the time of the agreement." Washington v. Brown, 92 Wash. App. 586, 602, 965 P.2d 1102 (1998); see also M.A. Mortenson Co., Inc. v. Timberline Software Corp., 140 Wash. 2d 568, 587, 998 P.2d 305 (2000) (en banc) (examining the conscionability of a consequential damages clause "at the time the contract was formed"). And, the question of unconscionability cannot be judged in the abstract, but rather it must be determined in light of the general commercial setting. Kohlenberger, Inc. v. Tyson's Foods, Inc., 510 S.W.2d 555 (Ark. 1974); Dow Corning Corp. v. Capitol Aviation, Inc., 411 F.2d 622 (7th Cir. 1969).

The difference in value, if any, between what Immersion received versus what Microsoft could receive does not rise to the level of unconscionability. The settlement with Microsoft provided Immersion with immediate and substantial income. At the time of contracting, Immersion was under significant financial strain and need immediate cash to

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 32
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

1  stay in business during a long and expensive battle with Sony. Exs. 9, 10, 13, and 17.

2  Immersion received $20 million to use for any general business purpose, plus an additional

3  $6 million from Microsoft's stock purchase, plus the ability to borrow an additional

4  $9 million. This was a lot of money for a company whose annual gross revenues were less

5  than that amount, and which had reported losses in every quarter since 1997. Ex. 13.

6  Microsoft received settlement of the suit, a license and sublicense and Immersion's

7  agreement that should it recover in the Sony Lawsuit, Microsoft would be paid back some,

8  all, or more than this amount. In entering into this agreement, Microsoft assumed the risk

9  that Immersion would lose the Sony Lawsuit, and Microsoft would not be able to recover

10  any of the $20 million. However, through the Sony Lawsuit, Immersion eventually

11  obtained a settlement for over $150 million.

12      The Microsoft Settlement provided Immersion with other benefits. Upon the public

13  announcement of the Microsoft settlement, Immersion stock nearly tripled in value.

14  Ex. 19. The deal also opened up new opportunities to Immersion. As Immersion stated in

15  describing the Microsoft Settlement, "The settlement with Microsoft enhances our ability

16  to pursue and execute in these new markets. It also provides us with significant resources

17  to actively protect and license our 196 haptic patents." (Ex. 57), and "They are the ideal

18  partner to help demonstrate the value and benefits of haptic technologies to consumer

19  markets. . ." (Ex. 56). Also, in a March 28, 2005 Forbes magazine article, Immersion's

20  CEO was quoted, "Viegas says the deal with Microsoft gave it a stronger negotiating

21  position with other companies, and should give it increased leverage with Sony should the

22  two come to the negotiating table." Ex. 20; Viegas Dep. 168:11-170:21.

23      Even standing alone, the structure of the payback obligations in Section 2(e) of the

24  SLA were designed to allow Immersion to retain the lion's share of any settlement with

25  Sony: Immersion would receive 85% of the first $100 million recovered, 75% of the

26  recovery between $100 and $150 million, and 82.5% of the recovery over $150 million.

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 33
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

As it played out, Immersion has received more than $150 million from Sony. In rough net terms, Immersion will keep the vast majority of its recovery against Sony—more than $125 million. This is certainly not a bad deal.

Immersion received significant value in the Microsoft Settlement. The SLA is not "shocking to the conscience," "monstrously harsh," or "exceedingly calloused," and does not rise to the level of an unconscionable contract. Summary judgment is appropriate on Immersion's substantive unconscionability affirmative defense.

## IV. CONCLUSION

For all of the reasons stated above, Microsoft respectfully requests that the Court grant summary judgment dismissing Immersion's affirmative defenses of champerty and maintenance, frustration of purpose, illegality, violation of public policy, unclean hands, unjust enrichment, and unconscionability.

DATED June 26, 2008.

RIDDELL WILLIAMS P.S.

By _____
Paul J. Kundtz, WSBA #13548
Blake Marks-Dias, WSBA #28169
Wendy E. Lyon, WSBA #34461
Attorneys for Plaintiff Microsoft Corporation

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 34
4825-6346-6242.08
062608/1330/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600

# CERTIFICATE OF SERVICE

I, Margaret R. Friedmann, declare as follows:

I am over 18 years of age and a citizen of the United States. I am employed as a legal secretary by the law firm of Riddell Williams P.S.

On the date noted below I electronically filed the foregoing document titled **PLAINTIFF MICROSOFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANT IMMERSION'S AFFIRMATIVE DEFENSES,** with an attached **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANT IMMERSION'S AFFIRMATIVE DEFENSES** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel for Immersion Corporation:

| | |
|---|---|
| Bradley S. Keller<br>Jofrey M. McWilliam<br>Email: bkeller@byrneskeller.com<br>　　　　jmcwilliam@byrneskeller.com | Richard M. Birnholz<br>Morgan Chu<br>Alan J. Heinrich<br>David R. Kaplan<br>Email: rbirnholz@irell.com<br>　　　　mchu@irell.com<br>　　　　aheinrich@irell.com<br>　　　　dkaplan@irell.com |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Seattle, Washington this 26th day of June, 2008.

Margaret R. Friedmann
Legal Secretary, Riddell Williams P.S.
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
Phone: (206) 624-3600
Fax: (206) 389-1708
Email: mfriedmann@riddellwilliams.com

MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
IMMERSION'S AFF. DEFENSES - (No. 07-936-RSM) - 35
4825-6346-6242.08
062608/1338/20363.00411

Riddell Williams P.S.
1001 FOURTH AVENUE
SUITE 4500
SEATTLE, WA 98154-1192
206.624.3600